So the first case today we have is 524-0112 Accuracy Firearms, LLC v. Governor J. Robert Pritzker, et al. I'm told, Mr. Drew, you're going to handle the initial argument. Mr. DeVore will do rebuttal. Is that correct? Yes. Okay. Yes, sir. And it's Mr. Ganning? Jonning. Jonning. Thank you. Mr. Drew, you ready to proceed? I am, Your Honor. Then go right ahead. May it please the Court, Counsel, Your Honors, we're here. Very straightforward case as it relates to an underlying complaint filed on behalf of what ultimately was 7,000 residents here of the state of Illinois concerning what I think has ultimately been called the assault weapons ban. And in that, it was a complaint filed originally by counsel, Mr. DeVore. And in that, it talked about multiple issues, but the one that we're really here about first and foremost is equal protection under the law as it relates to that. And the case was pending. Discovery was filed. There were motions filed by the state to stop the discovery process. The trial court took that under advisement, and it sat under advisement for a considerable period of time. And in that time frame, the Hawkins case proceeded through the court system and was at the Supreme Court level, and ultimately a ruling was had. And I think of most importance here is that what happened and why we're here today, as the court is well aware of, is because the trial court sua sponte dismissed the complaint, citing Hawkins and saying that, well, your issues are no longer valid. And that was within five days of the Hawkins decision coming down from the Supreme Court. There was no motion to dismiss by the state pending. There was a motion to dismiss by the state pending. It was not against the equal protection portion, I don't believe, under that. There was a motion to dismiss pending, but I think the equal protection portion was not set forth in that. There wasn't a 2-615 motion? There was a 2-615 motion, but I don't believe it pertained to that count as it related to the equal protection portion of it under those circumstances. As you say, under those circumstances, what are you talking about? Well, as where they were, there were issues they related to, I believe, the injunction request and other issues, but there was not, the way I look at the record, as it related to that count of the equal protection. Now, as it moved forward, we look at this and the court comes back and just dismisses our count, our complaint, five days after that. And so when we look at that, the court gave no real explanation as to how, other than citing Calkins. So when we look at that, we have to look at, well, a motion to dismiss. All well-pleaded facts have to be deemed true and factual as we sit there. And in this instance, when we look at it in the light most favorable to the nonmoving party, which in this case there was no moving party, we look at that and we say, well, the Calkins case was clearly a facial challenge under the equal protection. Clearly was. That's what the court ruled upon. There was no evidentiary hearing. There were no facts flushed out. It was done on a summary judgment basis, basically with the stipulation that this is where it's at. So in that, it's a clear facial challenge. So when we look at that under a de novo standard because of the motion to dismiss, we review that and we say, well, facial clearly is that it's unconstitutional under any set of facts, where obviously as applied, it's unconstitutional as it applies to the facts of the case, as you take the facts and apply them to the actual statute in some of the exceptions I think is what we're really referring to. And in our case, there was no evidence nor evidentiary hearing ever had left on a motion by the court to dismiss that count. So when we look at that and we look at the case cited by the petitioner, the appellants here, Rizzo, we look at that and we say, and I know in that Rizzo case that the court specifically cited that though the defendant did not specify whether or not the constitutional challenges were facial or as applied, there was a ruling in that under the circumstances where the trial judge there granted it not only facially, being unconstitutional, but as applied as well. And so in that, in the case law that goes along with the Rizzo case, the distinction between a facial and an as applied argument really doesn't have much to do at all with the pleadings. The pleadings are somewhat relatively similar because under the circumstances, you're talking about equal protection, you're talking about the constitutionality of the statute, wherein those two diverge is while they're not identical, they do diverge. And where they do diverge is to what evidence is presented in. One is a legal argument, a factual argument, but based on facts that in essence you bring up, as happened in the Calkins case, well, here's a scenario where one scenario where this statute works, so facially we're done. Now, as applied, they can go into many other things. And when we can look at that and in the allegations, and I believe the State had cited that, well, their complaint was the same as Calkins. Well, and in their brief, they talk about things such citations to arguments along the way that were made onto the record. And I think that they used cited to them, copied and pasted, virtually identical and similar. Well, virtually identical and similar are not the same. I mean, yes, they are very similar. Let me ask you about that, Mr. Drew. Yes, sir. Looking at that, it appears that the Calkins complaint has 17 paragraphs. Your complaint has the exact same 17 paragraphs, including the same typographical errors. Count one of the plaintiff's first amended complaint and count two of the Calkins complaint both seek a declaratory judgment that the act violates the three readings clause. The allegations in each complaint are identical. And count two of the plaintiff's first amended complaint and count four of the Calkins complaint seek a declaratory judgment that the act violates the equal protection clause. The allegations in each complaint are identical. Now, how is this court able to reach a different conclusion than the Illinois Supreme Court, given the fact that the complaints are identical? How are they not identical? Well, I think that, I don't know, I think there's some other paragraphs, and I think when we talk about that in the complaint that was filed in our case, we talk about paragraph 89, wherein we talk about the same situation between the individuals who were the plaintiffs in the case as well as the accepted individuals. And there's even a footnote, actually, in the complaint, where it talks about the same status as a jailer in paragraph 89, paragraph 94, and that is a footnote 7 in that, where we talk about the exempt status is irrational, and we talk about a jailer, and there's even a description in that footnote, wherein it talks about how a jailer, while they are a jailer, in what would be the sheriff's department or, I guess, a city police department, and while they're a jailer, then this statute doesn't apply to them. They don't have any of those obligations. And yet, the second they step out, well, then the question becomes is, well, do they get to maintain that? Does the statute apply to them? And in that instance, though, if we get down into the actual facts, when you look at some of these individual categories, particularly one would be the circumstances which are cited in the complaint concerning, like, security guards, they have absolutely no duty to the public at all. Security guards do not. They have no duty to do anything to anyone, nor to jailers. Jailers have no duty to protect the public. Jailers simply, if an inmate has left the facility, they can't apprehend them outside of there. Other than that, they have no duty to the public. And that's really a lot of where the Calkins case, the Supreme Court focused on, is talking about this duty. But in our case, we cite where those things are different, and that, in fact, without using the word duty, but we cite that these are the things that they have to do, and yet the plaintiffs in our case are identical to them in these subcategories. Now, law enforcement portion is different. I mean, they have a duty to the public. I don't think I understand why you say they're identical, and I'm not – I didn't hear an answer to Justice Moore's question. We have a lot of identical allegations between Calkins in your case. Yes. The one thing I didn't see in your case is how you pled that they were – the exceptions. I don't see that pled, and I think that was raised that it wasn't pled until the motion to reconsider. Well, I think, yes, the state talked about that. But an equal protection claim requires that you plead how your clients are similarly situated to the protected class. There is a discussion about that you talk about that, and in a couple – do you talk about similarly situated, your clients being similarly situated? Well, I think that would be Paragraph 89 and Paragraph 94, and particularly Paragraph 96, actually. Paragraph 96, the word similarly situated actually is used in Paragraph 96 under the circumstances. So I think the allegation is there, and now one could argue, well, you didn't put enough allegations, or I don't think it's quite sufficient, but the allegation was there, and similarly situated was used in Paragraph 96. So when we look at that, and we take the case law of Rizzo and the other cases along with it, that the real distinction between an as-applied and a facial challenge isn't so much the pleadings. It's the evidence. And in our case, we asked for discovery and sought discovery throughout, which was never ruled on by the court. It sat there in abeyance for a considerable period of time. And I think for those reasons, that's particularly why our case is different and why it is separate and apart from the Calkins case and why I believe this case should be remanded back for an allowance that – for the state to file anything as it relates to the equal protection account for the state at that point in time to determine that, the court to make some sort of a ruling as it relates to if the allegations are sufficient, because I think the allegations are there. Now, in addition to that, we have the second part of our appeal, and that involves the three readings rule. And in that, we're talking about the Constitution clearly of the State of Illinois and the requirement that any law or bill that comes forward in the State of Illinois must be read by title three times on different days in each – both of the House and the Senate, at which point in time the Speaker of the House and the President of the Senate certify, sign, in essence, and certify that all of the constitutional factors have been met. Now, in that, there is another – Dr. Drew, before you explain that to the court, since I think we all understand that, there is an argument that you forfeited the three-day reading rule because it wasn't raised in your motion to reconsider. What do you say about that forfeiture argument? I don't think that there's a forfeiture there of that under the circumstances because, in this instance, the three readings rule was argued and dealt with, and I think – Was it raised in your motion to reconsider? It wasn't expressly raised. The motion to reconsider mainly focused on the concerns that we had concerning the equal protection and the dismissal of the entire complaint. But in that, that was all a part of that in a discussion. But I do think the focus primarily in that was with the equal protection portion of the allegations. Now – Do you think under civil rules that it has to be raised in the motion to reconsider? I think that under the circumstances that we're in a position where I think the court can rule on it based on the fact that it was dealt with in the underlying case, the motion to reconsider, while it focused mainly on the equal protection claim, I think it was preserved under the circumstances of the manner in which the motion to reconsider was brought in the notice of appeal as we move forward. Thank you. And under this, once the Speaker of the House and the President of the Senate have, in fact, certified that all constitutional requirements have been met, that does, in fact, supposedly ends the discussion with the Enrolled Bill Doctrine. And the only thing I would really say as it relates to this is that one of the arguments made in the case that I argued down in White County was the state came in and said, well, even if we did violate the three readings rules, there's nothing you can do about it. And last time I checked when I went to law school, checks and balances are what the court does. And when the legislature blatantly violates the Constitution, I don't think there's a scenario where they get to say, yeah, and there's nothing you can do about it. And the U.S. Supreme Court threatened the legislature for the course of 20 years that if you continue to violate this, we're going to do something about it for 20 years. What about the case of the Friends of the Parks against the Chicago Park District? I understand the circumstances where the Supreme Court takes this as their sole province, I guess, where they can rule on some of these. But I do think there's still an issue as it relates to the fact that the Enrolled Bill Doctrine is clear. I understand that. I think the Supreme Court has taken that that the trial court can't do anything about it. But I do think the judiciary can always rule on it as it relates to violations of the Constitution under the circumstances. Is this court bound by the decisions of the Illinois Supreme Court? Yes, they are. I think that is true, that clearly the appellate court is bound by the Supreme Court decisions. But I think in this instance, I do think that the blatancy of the violations and the Supreme Court's admonishments for so long I think does put this in a slightly different light than what might normally be done where this is an issue that should be dealt with. Thank you. Do you have any questions before we let Mr. Kruger go? Not at this time, thank you. Thank you, Mr. Kruger. Thank you, sir. Go right ahead. Good morning, and may it please the Court. Assistant Attorney General Lee Jonig for the appellates. The plaintiffs in this case raised two state constitutional challenges to the state's ban on assault weapons and large capacity magazines. Both of these claims are foreclosed by Illinois Supreme Court precedent. Unless the Court prefers otherwise, I'll take these claims in turn, starting with the Equal Protection Claim and then the Three Readings Claim. With respect to the Equal Protection Claim, the Illinois Supreme Court in Calkins held that as a matter of law, the challenge statutes do not violate the Illinois Constitution's Equal Protection Clause. The plaintiffs in this case bring the same claim that was at issue in Calkins. The complaints are identical. If you go through them paragraph by paragraph, each count in the Equal Protection Claims are the same. And as a result, Calkins, which is binding authority, compels this Court to reach the same outcome on the same claim. Now, the plaintiff's argument now on appeal is that their claim is actually different from Calkins, that while Calkins brought a facial challenge, they are bringing an as-applied challenge. And just to kind of clarify what the difference is between those two claims are, a facial challenge is one that says this statute is unconstitutional in all circumstances, for everyone, regardless of who the person is, who the statute is being applied to. An as-applied challenge is a claim that, well, this statute, it might be constitutional for some other people, but it's unconstitutional as applied to me. And so that, what that requires is an assessment of that person's individual circumstances to determine if the statute is unconstitutional as applied to them. It's not a case where a facial challenge is just kind of a legal issue and an as-applied challenge just looks at facts generally, which is what the plaintiffs, which is what I understood the plaintiffs to be saying here today. You have to look at the individual facts of the individual plaintiffs. And there is nothing in the complaint that remotely suggests that. I looked at paragraphs 89, 94, 96, and while they do use the words similarly situated, they say nothing about the individual plaintiffs in this case. And that is how you know that it's a facial challenge, not an as-applied challenge. Just to sort of, and there's other things in the record that make clear that this is a facial challenge. For one thing, not only is it identical to Calkins, but the Illinois Supreme Court has said those allegations in Calkins, which are the same allegations here, are a facial challenge. And so that's determinative on that issue. And then moreover, you know, the plaintiffs in their, you know, throughout the record in this case indicated that the facts would be the same for every plaintiff. And that can only be true if it is an as-applied challenge. And I think, I don't think that an as-applied challenge for 7,000 plaintiffs would satisfy Joinder rules, for example. I don't think you could practically join 7,000 plaintiffs and then evaluate the individual facts of each person there. And so the plaintiffs plainly did not bring an as-applied challenge in their complaint, and they did not seek to amend their complaint to add an as-applied challenge, even though the facts about their individual circumstances were known to the plaintiff. I mean, certainly were known to the plaintiffs from the very beginning of this litigation. I do want to just briefly address this argument that, you know, you don't have to plead an as-applied challenge because you may not know the facts yet. But as I just mentioned, you know, the plaintiffs certainly know the facts of their own circumstances and why they have good firearms training and so why they are similarly situated to the exempt classes. And so those facts were available to them. And even if, you know, specific evidence was not yet available, you know, lack of discovery doesn't excuse a failure to plead. That kind of gets the pleading system backwards. You're supposed to plead first, and then as the litigation goes on, you determine if you can ultimately prove your claim. So this idea that, you know, we didn't get discovery yet doesn't excuse the failure to plead an additional cause of action if they wanted to bring one. And so all this court really needs to decide here is look to the complaints, determine that it's identical to Calkins, and that the plaintiffs didn't seek to amend until after the final judgment. That's all this court needs to decide. And based on that, it's clear that the Equal Protection Claim was properly dismissed. If the Court has no further questions on that claim, I'll move on to the Three Readings Claim. Any questions? Justice Case? There was no motion to dismiss pending as to the count two at the State. The motion to the State? I'm sorry. I can't remember exactly which count was numbered which, but there was a motion to dismiss. Equal Protection Pending. There was no motion to dismiss pending on the Equal Protection Claim. Correct. So what do you say about the Court's sua sponte dismissing a case for which there's no motion? There was binding authority that came out that made it clear that the Equal Protection Claim did not state a claim, and the Court didn't need to wait for a motion to apply that binding precedent. There are additional cases that we cited in our brief that make that very clear. Illinois Supreme Court cases are binding, and so the Court rightfully acknowledged that.  Thank you. But with the sua sponte dismissal, that foreclosed any ability for the plaintiffs to file a motion for leave to amend to the circuit court to either grant or deny. It just basically finished the case, so to speak, by dismissal. That's right, Your Honor. But as we argue in our brief, even if that dismissal hadn't happened and they wanted to move to amend in August 2023 for whatever other reason, that would not have satisfied the rules for amending a complaint because they had known about these alleged facts that would have supported an Equal Protection Claim for months before Calkins came down. And setting aside the Calkins decision, you can't just sit on allegations in a potential additional complaint and kind of wait and see and see what happens. And then, oh, maybe later, you know, now I'll add an additional cause of action. The rules are that you have to add, you know, seek leave to amend a complaint and add additional causes of action when they become available to you. We cited a case in our brief where a delay of just two months between when the plaintiffs learned of allegations and when they pled them was too long for, you know, to seek leave to amend. And in this case, you know, from the initial complaint and then it's, you know, it was very clear that the plaintiffs knew of these additional allegations until when Calkins came out, that was eight months. And so, you know, even just setting aside, you know, the final judgment issue, just that length of time alone is not, you know, wouldn't have been, you know, permissible to amend your complaint at that point. But the dismissal, Sue Esponte foreclosed that even argument being made that she just made that could have been done in a circuit court. I'm not an expert on civil procedure and filing of cases. I sit with one right here. But I'm pretty confident that in a lot of cases, civil cases, they get filed, the discovery process goes, and then in a vast majority of these, there are amendments along the way to conform to what may be found out during this discovery process. And then motions to dismiss, motions for summary judgment, then of course the pleadings and the motions move on. So with a Sue Esponte dismissal, that takes that all out the window. There was pending discovery that, and I'm not saying the state did, but according to the plaintiffs, their argument is the state set on that discovery and just sat on it and sat on it while all this other is going on in the Calkins case, I assume. And then basically their argument is they were foreclosed because of this Sue Esponte dismissal to even ask to have this amended. Correct? That's correct, Your Honor. But that you, you know, lack of discovery is not an excuse for failing to amend a complaint. We also cite cases to that end in our brief as well. The general rule is that when you become aware of allegations, you know, you don't need to have proven your allegations, you know, to sort of definitively win your case just to plead it in the complaint. But you do have to set forth your claims as soon as practicable upon learning of your allegations. And so, yes, in many instances after discovery, you learn of more claims that you might have against the defendant, and then you amend your complaint, you know, relatively quickly once learning those facts. But here what we have is these, you know, these new facts that the plaintiffs want to bring out, these allegations about, you know, prison wardens and their firearms training and the allegations about the plaintiff's own firearms experience. These were known to the plaintiffs long before the Calkins decision came out. We have, you know, a transcript from the TLO hearing shortly after the complaint was filed in which the plaintiffs are claiming that, you know, prison wardens don't have a lot of firearms training, so, you know, this argument is wrong. And then we have, you know, their own firearms training. I mean, that's certainly within their own knowledge. So this is not an instance of, you know, we learned more facts in discovery, and now we want to amend our complaint. It's an instance where they sat on these allegations, you know, put all of their eggs in the facial claim basket, and when that turned out to, you know, not work out for them, you can't just sort of wait until the 11th hour and then seek to amend. And so just to, unless there's further questions on the equal protection claim, just to address the three readings claim, as the plaintiffs acknowledged in their brief, this claim is foreclosed by Illinois Supreme Court precedent. The enroll bill doctrine, which is enshrined in the Illinois Constitution's text, means that plaintiff cannot sustain a three readings challenge when legislation has been certified, which it has been in this case. This Court is required to follow that as it is recognized in the appeal from the TRO, because the Illinois Supreme Court's precedent is very clear on this issue. And unless the Court has any further questions on that issue. What can you say about forfeiture, I'm sorry, of that issue? It is true that the plaintiffs did not raise that in their motion to reconsider. Do you believe the issue's been forfeited, or do we have to address the enroll bill doctrine? Well, I don't think the Court needs to address the enroll bill doctrine, because it should just follow the Illinois Supreme Court's precedent on this issue. As to whether it's forfeited, I suppose the Court could make an argument on that. The three readings claim was subject of a motion to dismiss, and I'm not prepared to speak on the interaction between a motion to dismiss and a motion to reconsider. But regardless, whether it gets to the merits or not, the merits are plainly foreclosed by the Illinois Supreme Court's cases on this issue. Okay. Did you have something? I have a lot. I'll start by, it seemed in your brief that you took our ruling in the original accuracy firearms to basically say that we must follow the precedent, and that is correct. But we also, and Justice Moore was on that panel with Justice Maughan and I, I don't think we basically said, and I've got the paragraphs here, that we should just blindly follow the three readings rule. In fact, the way I took it is we were basically calling out the legislature for not following the proper procedures. Do you have any answer to that? It's my understanding from the Court's prior opinion that it recognized that it had to apply the Illinois Supreme Court's cases on this issue, and I believe that that is still true. I think the word begrudgingly probably comes to my mind, that we had to follow the precedent, because I think we went on, and like I said, I've got it right here, and I can read it. We question the synopsis of continued adherence to the Illinois Supreme Court precedent in light of the legislature's continued blatant disregard of the Court's warnings and the constitutional mandates. The three-reading requirement ensures that the legislature is fully aware of the contents of the bills upon which they will vote, and allows the lawmakers to debate the legislation. Equally relevant to the three-readings rule is the opportunity for the public to view and read a bill prior to its passage, thereby allowing the public an opportunity to communicate either their concern or support for proposed legislation with their elected representatives and senators. Taken together, two foundations of the bedrock of democracy are decimated decimated by failing to require the lawmakers to adhere to the constitutional principle. Now we go on from there. We cite different states that addressed it. What are you reading from? I'm reading from Accuracy Firearms. This would be in the paragraph 43. Just for the record, I wanted to make sure. At paragraph 45, our lawmakers take a note of office to, quote, support the Constitution of the United States and the Constitution of the State of Illinois. The same is required for the Circuit Court Judiciary, as well as the Appellate and Supreme Courts and certain members of the Executive Branch. Allowing lawmakers to continue to ignore constitutional mandates under the enrolled bill doctrine, knowing full well the constitutional requirements were not met, belittles the language of the oaths, ignores the need for transparency in government, and undermines the language of this state's Constitution. That's what we said in Accuracy Firearms. Moving on. From your brief. It says, as noted, the three readings rule requires that those be, quote, read by title on three different days in each chamber of the legislature. Then it talks about the amendments. In 1970, the committee noted the rule was no longer needed to assist illiterate legislators. The revised rule required that bills be read by title, struck the appropriate balance avoiding undue haste, and without unnecessarily allowing the legislative process to be bogged down in the interminable delay of, quote, reading at large on three separate days. Now, I understand, I mean, I'm pretty confident that our legislators and senators are literate. They can read their right. I understand in the original Constitution, I'm not saying that those folks back then were illiterate, but it was probably a different time. No doubt about it. So I understand why you may not read a bill the complete way through on each reading. I understand that. But I also understand that if it is amended during that process, it should be read. In your brief, it says, the General Assembly held multiple hearings spanning a month about restricting assault weapons and LCMs, and these proposals were widely reported in the media. Both chambers rigorously debated the act. You cite 102D, Ill General Assembly House Proceedings, January 10, 2023, at pages 26 through 48, and 102D, Illinois General Assembly Senate Proceedings, January 9, 2023, at pages 18 through 34. So, when I pull up from the Illinois General Assembly website, the bill status of HB 5471 lists the short description, Insurance Code, Public Adjusters. Synopsis as introduced, it states it amends the Illinois Insurance Code. I'm not going to read what it does, but it all has to do with insurance. I don't believe there's one word in this synopsis as introduced that says anything about assault weapons, 50-round weapons, magazines, anything such as that. Then it goes and states, Senate floor amendment number 3, deletes reference 2. Again, I'm not going to list this, you all can find it on the website, but it's probably about 15 statutes. Then it states, replaces everything after the enacting clause, and there's where we get the language about prohibiting the sale of what we're here for today. So, then I look. It was filed, the bill was filed on January 28, 2022. First reading, January 31, 2022 in the House. Some things happen, add a co-sponsor, nothing of great importance. March 1, 2022, second reading in the House. Again, following that, there are certain things, they set it for third reading, add some co-sponsors. Routine business. March 4, 2022, third reading in the House, it passes. Again, adding co-sponsors, whatnot. So, I'm going to go back. So, the first reading on January, January 31, at that point, the synopsis is introduced that amends the Illinois Insurance Code. Nothing, as I stated, nothing at all regarding why we're here today. March 1, the second reading. At this point, there had been no amendment between the first reading and second reading, correct? Correct. Okay. Get to the third reading, March 4, 2022. Third reading, I'm sorry if I misspoke. At that point, no amendment whatsoever has been made, correct? Correct. Then we get to March 30, 2022. It gets to the Senate. I'm sorry, I misspoke. March 7, 2022, first reading in the Senate. Again, at this point, no amendments made, correct? Correct. Okay. November 30, 2022. Again, I'm looking at what's on the website. Looks like nothing's happened. Second reading. Again, and I know I sound like a broken record, but I'm sorry. At this point, no amendment ever made, correct? Correct. Not one word. I don't believe so. And again, tell me if I'm wrong. I just don't want to say definitively that a word wasn't changed. I don't know that's true, but you are absolutely correct, Your Honor. I understand. You weren't sitting. I assume you were not sitting. I was not. You were not taking part. I understand that. Don't take this that I'm saying that you were part and parcel of this, because I understand you weren't. Thank you, Your Honor. So then, November 30th, we have the second reading placed on the calendar for third reading. So it looks like beginning January 8th, 2023. Then we see a flurry of floor amendments. And then on January 9th, more amendments. January 9th, 2023. It's called for a third reading. Now, at this point, amendments have been made the day before and the day of the third reading. Correct? Yes, Your Honor. I won't say to be an expert. In fact, I know really nothing about the legislative process. My role is in a different branch of government. So I don't know hearings, what they do. I don't know what goes on in between them. That's not my business at this point. But again, your brief says there were multiple hearings and rigorously debated. Okay? Yes. Can I clarify that, Your Honor? Absolutely. So my understanding is that the committees that kind of gather information that sort of ultimately lead to bills, you know, they heard testimony from witnesses. You know, I think I don't know exactly how many there were. I know that there were people who had been really affected by firearms. Tragedies were among those witnesses. And that's not kind of recorded on the three readings. That's just those sort of amendments. And so the committee was engaged in that kind of fact-finding process before the substantive amendment occurred. And we cited, you know, I think things from the record that supported that, that sort of explained how that fact-finding process worked. So that's all that I was referring to in the brief, Your Honor. I understand. I understand that there are certain things that go on behind the scenes in the committees that set all this up. I fully understand that. But the point that I'm getting to is the amendments start on January 8th, continue into January 9th, the third reading, and it's not much of a reading, so to speak. So I pulled the transcript in. And they call, they do several things prior to getting to this issue. In fact, I think at some point. This is the transcript of what? This is the transcript of the Senate hearing for the third reading. I'm sorry. Did you pull that apart from the record or is this part of the record? I pulled this apart from the record. Where did you find it? I would need to ask my clerk because I couldn't find it. Luckily, my clerk knows where to find it. Could you just tell me the date?  State of Illinois, 102nd General Assembly, regular session, Senate transcript, 122nd legislative day, January 9th, 2022. Thank you. And to be fair, I should have given you a copy, but I got this late yesterday afternoon. I think at some point during the proceedings, a lengthy break was taken to deal with some things. So then we finally get to talking about this House bill at page 17 of the transcript. And it talks about the amendments. And then Senator Lightfield and then Senator Harmon states, Thank you, Madam President, I move for the adoption of the amendments. So we go through that. Page 18. The presiding officer, I'm assuming that's the president, Senator Lightfield. She states, third reading. Now on the order of third reading is House Bill 5471. Mr. Secretary, please read the gentleman's bill. And then the bill is read. And then there's some discussion. And then at page 20 of the transcript, the presiding officer, Senator Lightfield, sets the debate time and basically says, Be aware, we've set the debate time. It talks about five minutes. Again, I'm assuming that's five minutes per person who decides that they'd like to say something. I believe so, Your Honor, because my recollection is there were many legislators who spoke. And I'm not going to go through all this. I know I'm taking a lot of time, and I apologize. But I want to be clear on this point. I think Senator Rose, Senator Bryant, Senator Bailey weighs in. Senator Anderson talks about the hypocrisy and whatnot of the weapons of war. I'm not going to get into that either. So to me, the bottom line is that this bill was amended after three full readings in the House and two full readings in the Senate. It was completely gutted. It was completely changed. I don't think I'd have to look at it again. I can't sit here and say that not one word in the final is the same as it was in the beginning. But I'm pretty sure it is non-recognizable. I will admit it might look by the third reading that some debate was made when you look at what the senator said. And I applaud them for making those arguments. But at that point, wasn't it a little too little too late for them to really get any meaningful debate done at the third reading on a gutted bill that had nothing to do with the original bill? I can't speak to sort of the quality of the debate, you know, on sort of the floor. You know, we pointed to the committee hearings. So this process had gone on for longer than just those couple of days. But just to your kind of broader point, Your Honor, the Illinois Supreme Court can certainly revisit its cases on this issue. And, you know, it thus far has declined to. So that's, you know, our only argument here is not kind of the merits of the Enroll Bill Doctrine and whether it's a good idea. You know, it's just that the Illinois Supreme Court has kind of laid out what its rule is and its current interpretation of the Illinois Constitution. And so that's kind of just the limited sphere in which we're operating here. And again, I understand you are not a part of that process. I just want to make my record clear. Certainly, Your Honor. And if the court has any further questions on the three readings claim. Justice Cates? No. Justice, no questions. Thank you. We would ask the court to affirm the judgment. Thank you very much. Mr. DeVore? Thank you, Your Honor. Thank you, Justices, Counsel. I'll be brief. Judge, as to the issue of the three readings rule, Justice Cates, I don't believe that the issue has been forfeited because we didn't raise it in a motion to reconsider. No. Not familiar with any jurisprudence that would say that's the case. Obviously, we understood the trial court had to follow the precedent, and so we didn't ask to reconsider what we knew they couldn't reconsider. But we leave, following the motion to reconsider on the equal protection, preserve all issues that we might be desirous to appeal. Judge, there is one thing that is similar to all three or four of those amendments that's exactly identical. It's called the title. The title doesn't change. As to the issue of equal protection, the equal protection issue, there is no legislative record in this case. None whatsoever. And so for us to be able to allege with specificity how our plaintiffs were similarly situated to the exempt persons is impossible without a record. We have alleged what we knew. Mr. DeVore, how can you say that, really? I mean, you know whether your client is a police officer or a prison official, or you know what your client's individual characteristics are. Judge, with all due respect to the court, those included categories are not even something that we could have any knowledge that were the exempt categories. What we do know is that after Calkins, there was no motion to dismiss on file for count two. We were not on notice that there was any defect in our case. Once Calkins came out, I'm here to tell this court, with the Calkins ruling as binding precedent in this state, every one of the 7,000 plaintiffs in our case has an equal protection claim. And here is why. Because the Calkins case made it clear, according to this state Supreme Court, that if there's a duty to protect, coupled with training, you're exempt. Duty to protect is the paramount issue. We found that out when Calkins came down. Five days later, our equal protection claim gets dismissed, sua sponte, with no chance to replead. What do every one of the 7,000 plaintiffs in our case have in common with a significant amount of the exempt categories? No duty to protect. None of our clients have a duty to protect. I'll stipulate to that. But guess what? The only exempt categories in that law that have a duty to protect are current active duty law enforcement. Retired law enforcement has no duty to protect. Security guards have no duty to protect. Prison guards have no duty to protect. Duty is a legal obligation. We could have, at a minimum, if judge wanted to say, we don't think that's pled, again, there's no motion on file, we could have amended that complaint and gilded the lily on that. But we had no opportunity to do so. No opportunity to do so. Once Calkins came down, justices, we then had a framework to start having a way to articulate what the issue of summary situated meant. We had tons of discovery pending, tons of discovery pending, getting into trying to figure out, guess what? What's the basis of these exempt categories? We had no knowledge of the basis of the exempt categories until Calkins came down. And after that, our case was thrown out with no chance to defend our clients. So for that reason, we ask you to send it back. Thank you. Do you have any questions? I don't understand when the Supreme Court in Calkins says that you have to show you're similarly situated to the exempt categories, how you can say that you couldn't do that in your pleading up front. How you can say that you didn't plead similarly situated under an, I mean, that is the rule in equal protection. Of course it is. You have to show you're similarly situated to a certain class.  And then the question I would pose to you, Justice Gates. You don't get to ask me questions. No. The argument that I would pose to you is that there is zero legislative record in this case. Zero. Well, my problem is when you plead a case, you know whether your client is similarly situated or not to an exempt class or other class of people. And you didn't plead that in this case. I would respectfully disagree with that premise, merely because of the fact that this case, there's no record. You need a record. You keep saying that, but I don't understand. We have a law. A record of what? We have a law that enlists a laundry list of people that work in certain employment. Well, what do you need a record of? I need to know what the reasoning was for exempting out all of these categories. We have no knowledge of why. The equal protection clause does not say you get to know a reason. It says you need to plead that you are similarly situated. You have the statute, which has the category of people. So I don't understand why you need a record. Nobody else needs a record to plead equal protection violations. Judge, but I respectfully disagree, because at a minimum, if I were to accept what you propose, we should have been able to re-plead, because if the State would have filed a motion to dismiss our equal protection claim, saying you have not pled similarly situated, and then we know what similarly situated is, only after Calkins come out do we know what similarly situated means. We could have pled that, and we actually could have been in a position post-Calkins to plead an equal protection claim. As I'm here to say, every one of our clients would have won, because duty to protect. If the legislative record would have said, look, we've exempted these categories out, because they have a duty to protect the public, and they have training, we could have pled that easily. But again, we didn't have, and even this Court's ruling in the TRO pointed out the impossibility of pleading some of those issues because of the absence of the record. Calkins said that our ruling in the TRO case was not well-founded. It abrogated our case from Calkins. From a facial challenge, I don't disagree with the Supreme Court. Again, the Supreme Court only dealt with a facial challenge. They had no record. The Fifth District case is abrogated by Calkins. Do you agree with that? I do agree with that. Okay. Absolutely, I agree with that. But the Supreme Court case, what it did is it laid a foundation for anybody in this State to be able to appreciate, if you want to raise equal protection against that law today, you have the basis for doing so, absent legislative record. What do you say to people who never have a record, that they can never plead equal protection violations? That they never have a record. If they never have a record, you're not going to have a record in this case. Because the record you seek would have been public. It has nothing to do with the State sitting on discovery. The record you seek would have been public, just like this justice got the hearing on his own. You're right, ma'am. And if you go on, the three readings rule was specifically for the purpose of advocating the record. If I go to the record and I've read it all. Did you get the same record as this justice got? I've read it all, ma'am, and there's nothing in there, nothing in there, that talks about what is the reasoning, what is the rationale of the legislature for exempting out these persons? It does not exist. The Supreme Court created it. What's my point is, what do you do on an equal protection claim generally if there is no, quote, record as you seek? What we were doing is we had engaged in significant discovery. But the discovery doesn't exist. There's no, you claim there was no three readings record. So it wasn't done properly. There wasn't enough discussion. So what if there is no record? That hypothetical doesn't exist in this case, ma'am. But it exists in this nation, in the state of Illinois, where there's not always a record. I think the state of Illinois is unique in the regard that we pass laws that abrogate people's constitutional rights with nothing in the public record for the citizens to appreciate. But I'm going to ask you this hypothetical. What do you do, I'm going to ask it again. Yes, ma'am. What do you do when there is no record? Can you plead an equal protection clause claim? I don't think until you have a record, no. So for any case where there's no record, you're saying that there can be no equal protection claim fled properly. I'm saying the burden is then on the plaintiff to figure out the reasoning of the legislature. You don't have a choice. Exactly. What you just said is exactly the rule. The burden is on the plaintiff to figure out the equal protection rule. That was you in this case. And that's what we were attempting to do, because if I follow the premise of Justice Gates, that every legislature in the nation could abrogate and violate people's constitutional rights, don't create a record in the legislative process, and then you're left unable to defend yourself. I don't buy that, ma'am. I just don't. That's what we were trying to do. We were trying to figure out. That's public. What's that? That's public. What's public? Whatever record you seek had nothing to do with the state's discovery. What you sought was as public as what Justice Owey was able to retrieve on his own. That's not true. What we were seeking was what exists today. It's not on this record. What exists today are e-mails between state legislative actors and other administrative bodies, like the Illinois Association of Police Chiefs. There's e-mail strings out there laying out that they were going to exempt these categories out for political support. I know they exist, Justice, but I don't have them because my discovery was delayed by the state, and the courts sat on it. And if I could have gotten my hands on those e-mails that I've already been told exist, I could have laid out for the courts that a lot of these exempt categories had nothing to do with a legally appropriate exempt basis. It was being done for political purposes. If you knew they existed, why didn't you plead it? Because I found out after Judge Jarman had already refused to deal with discovery issues. When we started figuring these things out, we got delayed. I assume that's true. Yes, ma'am, it is. Why didn't you amend your complaint? Amend the complaint? We couldn't do anything until we knew what the basis was. All I have is ten categories of employees. You could have amended your complaint upon information and belief. If I'm going to amend a complaint with all due respect to the court that's not been attacked by the plaintiff as being insufficiently pled, I don't think I can amend it. Well, I see where the motion on the second amended complaint was not filed as to your equal protection. Correct, ma'am. I acknowledge that. Yes, ma'am. And so, again, we have been pleading a long time in litigation. And if I have a complaint, count two, that's not been attacked as insufficiently there's no reason to amend that pleading. As Justice Bowie says, we're figuring out in discovery, what is the basis of these exemptions? Why did you exempt these categories? So we have to plead more specificity. I mean, think of the absurdity of this. I just don't know of any equal protection case that says you have to know why you're in a similar situation. I have to prove to you. Point me to any case that supports your argument of why. I know the equal protection law says you have to plead similarly situated. I don't know it says that you have to have a record. And so I'm struggling with that issue, Mr. DeFore. I have to have facts, Your Honor. I have to have facts to present to the court of why my clients are similarly situated. Well, you know whether your client is a police officer, retired police officer, security guard. You know what the situation of your own client is. True, but there's nothing in the record, ma'am, that says or even infers that these persons' employment in and of itself was the basis of their exemption. And actually, the Supreme Court of Illinois didn't follow employment. All we knew was that these employee categories were exempt. But you know why? There's no reason to believe that they're going to be exempt from a law such as this merely because they're a prison guard, merely because they're a security guard at Walmart. We have no basis to believe that is why the legislature deemed them exempt. We have no reason to know that. And that's what we were trying to figure out is what is the basis of these exemptions. All I know is that these are employment categories. I'm not going to assume the legislature exempted them out because of employment categories. And again, the Supreme Court then said, the Supreme Court didn't say, well, because of these employment categories they're exempt. The Supreme Court said they have a duty to protect the public. If you have that duty and you have attorney, you're exempt. Current law enforcement officers fit that category. We then were, after the Calkins ruling, ma'am, we were in a perfect position, perfect position to come back into the trial court. And if we had to amend, we could have. Nobody asked us to. And we could prove that we, all 7,000 of my clients, because they have no duty to protect, they don't even care about that. Even if there's some law enforcement officers in my case, I don't care. Because there are numerous categories of these exempt persons that fail under the Calkins standard because they have no duty to protect. We would have won that case. The state knows we can win that case, which is why, again, I think they were surprised by the fact that Judge Jarman dismissed our Count 2 with no motion pending. I think they were surprised. And, again, what do we do, Your Honor, if this case doesn't go back, which it should? We'll find a plaintiff and file a more specific case that pleads and has applied challenge with specificity. I mean, again, there's no suggestion that Calkins forecloses and has applied challenge. There's no argument of that because it doesn't. Calkins, what it did is gave every one of the clients, the plaintiffs in this case, an avenue to win this equal protection case. And, again, they played it how they wanted to play it. They stalled us out. They bought the case now. They let Calkins run on a facial challenge, didn't let us get to the discovery so we could figure out what's the basis of the exemptions. And, again, with all due respect to Justice Gates, merely because they worked in a particular employment field, that's irrational. And for that reason alone, we couldn't plead any more specificity than we had at the time. Once Calkins came out, we were in a position, we could have pled to the nth degree. We would foreclose from doing that. And if this Court sends that case back, we could, if Judge Jarman says we need to plead more specificity to make it clear that it's an as-applied challenge versus facial, we can deal with that really all day long. But we never got a chance to do that, Justices, and that's why I think we should. Why didn't you file the as-applied front? As-applied to what? An as-applied challenge up front. Well, I think we did. And I think my colleague pointed it out. When you're dealing with as-applied versus facial, it's more about the scope of relief that the Court can grant as compared to the pleading analysis. Again, we knew similarly situated in our complaint, and we did. But again, before we can really even deal with, is this a facial challenge? Is this an as-applied challenge? You have to understand what's the essence of this law. As Justice Brewer pointed out, there was no debate on this law of any significance. It didn't – the three rings rule created the situation that we're in right now. And I would say this, Justice. The Supreme Court 20 years ago left it open when they said, if this continues, we reserve the right to revisit this issue. Does we mean only the Supreme Court of Illinois? I think this Court could take the opinion, if it wanted to, that we means the courts. And I would ask the Court to think about that. This case needs to go back, gentlemen, ma'am. It does. It does again. Coffins, if we call it good law, I don't like it, but I'll accept it. Every one of the clients, plaintiffs in this case, have an equal protection claim because if they have no duty to protect, I'll – again, for argument, stipulate, they're just citizens. They have no duty. Retired law enforcement has no duty. Prison guards have no duty. Bad lawyers have no duty. You're saying that the Supreme Court was wrong in its analysis. No, what I'm saying is the Supreme Court ruled that if you have a duty to protect and you have a claim that it's not an equal protection violation. What I'm saying is I disagree with that, but I accept it as good law in this state. But you're pointing out certain categories who have no duty to protect. They didn't deal with that in a facial challenge. Good question, ma'am, because any facial challenge, all of them the court has to find is one instance to where the case survives constitutional muster. And in this particular case, current active duty law enforcement, it's been trained, obviously, is not violent of equal protection. So the Supreme Court stopped because Coffins never went to the next level and said, okay, on a facial argument like that, it's good. But as applied, we dig into all of these categories individually. And you say, does Jim, in our case, who's a citizen, assuming he's not a convicted felon, he has no duty to protect the public, et cetera. When you apply this law to Jim as it relates not to just one instance, like law enforcement, but to all of these categories, Jim wins. And that's where Coffins failed. Coffins took a facial challenge that I knew was going to lose the moment he took it. Because there was one instance, one instance to where that law passes equal protection muster with current law enforcement. If you read the case the Illinois Supreme Court relied upon, the federal case out of the East Coast, it dealt with current active duty law enforcement as it related to citizens. They said it doesn't violate equal protection. The Supreme Court of Illinois didn't get into these other categories, which is where this case needs to go, because then it violates. Because, you know, this court can go back in five minutes and see that retired law enforcement has no duty to protect. If you follow Coffins and you have no duty to protect, it can't be an exempt category. But the law has them in there, which means it violates equal protection. Anything else, gentlemen? Ma'am? Justice Moore, any questions? No questions. Thank you, Senator DeVore. Well, counsel, thank you for your arguments today. Thank you for your patience with us. We will honestly take the matter under advisement. We will issue an order in due course.